No. 10-16398

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

MEGAN MAREK; BENJAMIN TROTTER, Class Members,

Objectors-Appellants,

v.

SEAN LANE; et al.,

Plaintiffs-Appellees,

and

FACEBOOK, INC., a Delaware corporation; et al.,

Defendants-Appellees.

---

On Appeal from the United States District Court for the
Northern District of California
District Court Case No. 5:08-cv-03845-RS
The Honorable Richard G. Seeborg

---

**APPELLEE FACEBOOK, INC.'S ANSWERING BRIEF**

---

Michael G. Rhodes
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
(415) 693-2000

Lori R. Mason
Mark F. Lambert
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Theodore W. Ullyot
Colin S. Stretch
FACEBOOK, INC.
1050 Page Mill Road
Palo Alto, CA 94304
(650) 485-6271

*Counsel for Defendant-Appellee Facebook, Inc.*

## TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT ........................................1

STATEMENT OF ISSUES ................................................................2

STATEMENT OF FACTS ...............................................................3

I.      Facebook and the Beacon Program ...............................................3

II.     Plaintiffs Filed a Putative Class Action Regarding the Beacon
        Program, and the Parties Reached a Settlement Agreement with the
        Assistance of a Mediator. ..............................................................5

III.    The District Court Held Two Extensive Fairness Hearings and
        Approved the Settlement as "Just, Fair, and Reasonable." ...........8

SUMMARY OF ARGUMENT ...........................................................12

ARGUMENT .................................................................................15

I.      Standard of Review......................................................................15

II.     The District Court Acted Well Within Its Discretion in Approving the
        Settlement. ..................................................................................15

        A.    A Cy Pres Award to the Foundation Is Appropriate. ..........17

        B.    Appellants Waived The Argument That The Court And Not the
              Foundation Should Determine Who Receives Cy Pres
              Distributions ....................................................................21

        C.    The District Court Did Not Abuse Its Discretion in Approving a
              Settlement Under Which the Court Does Not Personally
              Oversee the Grant-Making Conducted by the Foundation. ..........22

        D.    The Distinguished, Relevant, and Varied Backgrounds of the
              Foundation's Board of Directors Lay to Rest Any Concerns
              About the "Track Record" of the Foundation. ..................25

        E.    The District Court Adequately Scrutinized the Settlement for
              Any Potential for Conflict of Interest...............................27

              1.    The Structure of the Foundation Assures No Conflict of
                    Interest...................................................................28

# TABLE OF CONTENTS
(CONTINUED)

PAGE

2.    A Cy Pres Remedy That Takes the Defendant's Perspective Into Account, or Even Benefits a Defendant, Is Permissible. ........................................................... 29

CONCLUSION ..................................................................... 31

CERTIFICATE OF COMPLIANCE PURSUANT TO FRAP 32(A)(7)(C) AND CIRCUIT RULE 32-1 ........................................................... 32

STATEMENT OF RELATED CASES ................................................. 33

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Beecher v. Able*,
  575 F.2d 1010 (2nd Cir. 1978) ..........................................................24

*California v. Levi Strauss & Co.*,
  41 Cal. 3d 460 (Cal. 1986)................................................................17

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ..........................................................15

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
  321 F.3d 878 (9th Cir. 2003) ............................................................21

*Diamond Chem. Co. v. Akzo Nobel Chem. B.V.*,
  517 F. Supp. 2d 212 (D.D.C. 2007)...................................................30

*Dukes v. Wal-Mart Stores, Inc.*,
  603 F.3d 571 (9th Cir. 2010) ............................................................15

*In re Folding Carton Antitrust Litig.*,
  687 F. Supp. 1223 (N.D. Ill. 1988)....................................................24

*In re Folding Carton Antitrust Litigation*,
  744 F.2d 1252 (7th Cir. 1984) ..........................................................20

*Francisco v. Numismatic Guar. Corp.*,
  No. 06-61677-CIV, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008) ......16

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .....................................................15, 22

*In re Lease Oil Antitrust Litig. (No. II)*,
  MDL No. 1206, 2007 WL 4377835 (S.D. Tex. Dec. 12, 2007)...................24, 30

*Linney v. Cellular Alaska Partnership*,
  151 F.3d 1234 (9th Cir. 1998) ..........................................................15

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ............................................................15

### TABLE OF AUTHORITIES
#### (CONTINUED)

PAGE(S)

*In re Mexico Money Transfer Litigation,*
    164 F. Supp. 2d 1002 (N.D. Ill.
    2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) ...................................passim

*Molski v. Gleich*,
    318 F.3d 927 (9th Cir. 2003) ............................................................15

*Nelson v. Greater Gadsen Housing Authority,*
    802 F.2d 405 (11th Cir. 1986) ..........................................................30

*New York v. Keds Corp.*,
    No. 93 CIV. 6708, 1994 WL 97201 (S.D.N.Y. Mar. 21, 1994) ........................16

*Parker v. Time Warner Entm't Co.*,
    239 F.R.D. 318 (E.D.N.Y. 2007) ........................................................30

*Powell v. Georgia-Pacific Corp.*,
    119 F.3d 703 (8th Cir. 1997) ............................................................17

*In re Relafen Antitrust Litigation,*
    231 F.R.D. 52 (D. Mass. 2005) ..........................................................19

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1673 (2009) .................16

*Securities & Exchange Commission v. Bear Stearns & Co.*,
    626 F. Supp. 2d 402 (S.D.N.Y. 2009) ..............................................20, 22, 23, 24

*Shaffer v. Cont'l Cas. Co.*,
    362 Fed. Appx. 627 (9th Cir. 2010) ...................................................21

*Six Mexican Workers v. Arizona Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) .....................................................17, 19

*Zients v. LaMorte,*
    459 F.2d 628 (2nd Cir. 1972) ...........................................................24

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE(S)

**STATUTES**

18 U.S.C.
§ 1030.................................................................................................5
§ 2510.................................................................................................5
§ 2710.................................................................................................5

California Civil Code § 1750 ...............................................................5

California Penal Code § 502 ................................................................5

Federal Rule of Appellate Procedure
26.1....................................................................................................1
31(a)(7)(C) .......................................................................................32
32(A)(7)(C) ......................................................................................32

Federal Rule of Civil Procedure
23........................................................................................................8
54(b)..................................................................................................24

Ninth Circuit Rule 32-1 ....................................................................32

**OTHER AUTHORITIES**

3 *Newberg on Class Actions* § 10:17 (4th ed. 2010) ...............................16

## CORPORATE DISCLOSURE STATEMENT

Counsel for Defendant-Appellee Facebook, Inc. certifies the following information in compliance with Federal Rule of Appellate Procedure ("FRAP") 26.1: Facebook, Inc. has no parent corporation, and no publicly held company owns more than 10% of Facebook's stock.

Dated: December 15, 2010

COOLEY LLP


By:   /s/ *Michael G. Rhodes*
        Michael G. Rhodes

## STATEMENT OF ISSUES

1.    Did the district court act within its broad discretion in approving a class action settlement agreement that provides for a *cy pres* distribution to a privacy foundation the express directive of which addresses the interests underlying plaintiffs' claims?

2.    Did Appellants waive the argument that the district court improperly transferred its discretion to the Foundation by failing to raise this argument in the district court?

3.    Did the district court act within its discretion in approving a class action settlement agreement under which decisions as to the specific distribution of *cy pres* funds are made by a Foundation where the district court expressly retained jurisdiction?

4.    Did the district court act within its discretion in determining that a *cy pres* distribution to a newly formed Foundation was appropriate where the Foundation's board of directors is comprised of individuals with distinguished, relevant, and varied backgrounds?

5.    Did the district court act within its discretion in approving a class action settlement agreement that creates a Foundation with a board of directors whose directors are selected by the parties where the Foundation is carefully structured to ensure no single perspective predominates?

2

# STATEMENT OF FACTS[1]

## I.    Facebook and the Beacon Program

Facebook operates a leading online social network that enables users to connect and share with their family, friends, and the world around them.  *See* ER 143.  People use Facebook to keep up with friends, upload photos, share links and videos, and learn more about the people they meet.  ER 144.  Facebook's service is and always has been free.  ER 144.  Users agree to a set of terms of use, create unique profiles, and decide who can see the content they share, and an array of robust web technologies are immediately at the users' disposal.  ER 144-45.

On November 6, 2007, Facebook launched a new program called "Beacon." ER 147-48.  Beacon allowed Facebook users to share information about their activities elsewhere on the Internet with their Facebook friends.  It worked by posting to the user's Facebook profile various actions the user had taken on other sites—such as posting an item for sale, completing a purchase, or scoring a high score in an online game—and thereby enabling users to make that information available to the user's friends.  ER 141-43; 156-58.  Facebook enables users to

---

[1]     An appeal filed from the same final judgment by different objectors to the Settlement Agreement (Appeal No. 10-16380, *McCall v. Facebook*), is currently pending before this Court.  The two appeals have not been formally consolidated. To facilitate this Court's review, the Statement of Facts in this brief and that contained in Facebook's brief in the *McCall* appeal are virtually identical, except for short additional paragraphs necessary to address certain additional arguments raised by McCall.

control who can see their profiles; as a result, Beacon information could be seen only by those whom the users had previously designated in their privacy settings. ER 144-45.

As part of the Beacon program, Facebook presented the Facebook user with a "pop-up" dialog box after the user had completed a particular "triggering" action on third party web sites participating in Beacon. ER 150. The user could then send information about the transaction ("the story") to Facebook by taking no action or closing the pop-up, or the user could choose to decline publication of the information related to the transaction. *Id*. If the user did the former, the next time the user visited Facebook, the user's home page displayed an alert message reminding the user that this story was not yet posted, and presenting the user with the option to decline to post the story. ER 147-48. If the story was posted, it became visible to the user's Facebook "friends" or those in the user's network, depending on what privacy settings the user chose. ER 141-43. On December 5, 2007—two months after the program launched—Facebook released a privacy control intended to allow Facebook users to opt-out of Beacon entirely. ER 157-59.

II.    **Plaintiffs Filed a Putative Class Action Regarding the Beacon Program, and the Parties Reached a Settlement Agreement with the Assistance of a Mediator.**

On August 12, 2008, Sean Lane and eighteen other Facebook users filed a putative class action against Facebook and certain sites that participated in the Beacon program in the United States District Court for the Northern District of California, alleging violations of (1) the Electronic Communications Privacy Act, 18 U.S.C. § 2510 (1986), (2) the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (1986), (3) the Video Privacy Protection Act, 18 U.S.C. § 2710 (1988) ("VPPA"), (4) California's Consumers Legal Remedies Act, California Civil Code § 1750, and (5) California's Computer Crime Law, Penal Code § 502.

On October 10, 2008, Facebook filed a motion to dismiss the class action complaint.  ER 207.  Before plaintiffs filed their opposition to the motion, Facebook and plaintiffs agreed to enter into private mediation.  ER 50.

On December 9, 2008, counsel and senior corporate representatives for Facebook and counsel for plaintiffs met in person in the offices of Gregorio, Haldeman, Piazza, Rotman, Frank & Feder in San Francisco, California for mediation with the assistance of Mr. Antonio Piazza.  ER 54.  The mediation session included joint meetings between the parties' representatives to review particular issues relating to plaintiffs' previous findings regarding the mechanics of

5

users' interactions on Facebook's website and the websites that participated in the Beacon program. *Id.*

At the end of the mediation session, the parties agreed on all substantive relief and memorialized their mutual understanding in a document outlining the principal terms of settlement. *Id.* The parties did not discuss the amount of any incentive fee or payment to class counsel until after reaching agreement on the other terms of settlement. ER 50. The parties continued to engage in settlement negotiations for the next seven months to work out the details of the Settlement. ER 55-57. The parties concluded their negotiations and finalized the terms of the Settlement in August 2009, after yet another mediation session on July 28, 2009 before Mr. Piazza. ER 55-56. The parties signed the Settlement Agreement on September 17, 2009. ER 101-124. As the district court found, "the Settlement was only achieved after intense and protracted arm's-length negotiations conducted in good faith and free from collusion . . . ." ER 14.

Under the Settlement Agreement, Facebook agreed to establish and administer a cash settlement fund of $9.5 million, to be used to create and operate a privacy foundation devoted to funding and sponsoring programs designed to educate users, regulators, and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and to

protect users from online threats (the Digital Trust Foundation, hereinafter referred to as the "Foundation"). ER 109-113.

The structure of the Foundation is carefully crafted to ensure the viewpoint of one particular director will not predominate. The Foundation's Board of Directors consists of three members, none of whom can veto funding decisions and all of whom must unanimously agree on a plan for the succession of directors on the Board. The initial three members of the Board are well-respected individuals with backgrounds directly relevant to the Foundation's mission to promote the safety and security of personal information online:

- Timothy Sparapani is Director of Public Policy for Facebook. Prior to that role, Mr. Sparapani was Senior Legislative Counsel at the American Civil Liberty Union. In that role, he specialized in privacy rights and represented civil liberties groups before Congress and the Executive Branch. ER 61.

- Chris J. Hoofnagle is the Director of the Information Privacy Programs at the Berkeley Center for Law and Technology and a Senior Fellow at the Samuelson Law, Technology & Public Policy Clinic. He was formerly the Director of the West Coast Office and Senior Counsel of the Electronic Privacy Information Center or "EPIC," a research center focused on issues concerning civil liberties and privacy. *Id*.

7

- Larry Magid is a board member of the National Center for Missing & Exploited Children and a member of the Obama administration's Online Safety and Technology Working Group.  He is also on the advisory boards of GetNetWise.org and the Family Online Safety Institute and served on the Internet Safety Technical Task Force.  *Id.*

In addition to funding the Foundation, Facebook, through the Settlement fund, agreed to cover the cost of all notice and administrative fees and attorneys' fees and expenses.  ER 110-12.  Facebook also agreed to terminate the Beacon program within sixty days of preliminary approval of the Settlement (which it did).  ER 113.

## III.   The District Court Held Two Extensive Fairness Hearings and Approved the Settlement as "Just, Fair, and Reasonable."

On October 14, 2009, the district court heard plaintiffs' motion for preliminary approval of the Settlement Agreement.[2]  On October 23, 2009, the district court issued an order preliminarily approving the Settlement, certifying a Settlement class, and concluding that the proposed class notices met the requirements of Federal Rule of Civil Procedure 23 and due process.  ER 83-84.

---

[2]     At the same time, the district court also considered a motion to intervene by class action plaintiffs in a Texas case against Blockbuster related to Blockbuster's alleged violations of the VPPA in connection with the Beacon program, which the Court ultimately denied.  (Defendant-Appellee Facebook's Supplemental Excerpts of Record ("SER") 67.)

8

Following the district court's order, the parties sent direct notice of the Settlement to over 3.6 million potential class members via email, published the notice in *USA Today*, posted the notice in the "Updates" section of the Inbox section of Facebook users' personal accounts, and set up a dedicated website and toll-free phone line.  ER 89-99.  The parties received 108 requests for exclusion from the class and only four objections, including one by Appellant Marek and one by Appellant Trotter, both Facebook users and purported members of the Settlement class.  ER 17.

On February 10, 2010, plaintiffs filed a motion for final approval of the class Settlement.  ER 8.  The district court held a final fairness hearing on February 26, 2010.  ER 8.  In addition to counsel for Facebook and plaintiffs, counsel for appellant Ginger McCall, who was another one of the four objectors to the proposed Settlement, appeared and presented argument in opposition to the Settlement.  SER 2, 5.  Counsel for Appellants Marek and Trotter did not attend the hearing.  SER 3.  On March 17, 2010, the district court issued its findings of fact, conclusions of law, and order approving the Settlement.  ER 8-17.

In approving the Settlement, the district court explained that it considered many factors, including: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in

Settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed Settlement. ER 12-13.

In his findings, Judge Seeborg highlighted the objections filed and noted that he "has been advised of all objections to and comments regarding the Settlement, and has given fair consideration to such objections and comments." ER 12. The court added that it "has considered the record in its entirety, all objections and comments submitted to the Court, and the arguments of counsel for the parties and all other persons seeking to comment on the proposed Settlement." *Id.*

The district court then turned to the arguments "most strongly pressed by the objectors and the commentators," namely that "the Privacy Foundation created by the Settlement is both unnecessary and unduly subject to the influence and control of Facebook." ER 16. As far as the need for the Foundation, the district court concluded that "[a]lthough theoretical efficiencies might arise from giving the [S]ettlement funds to an existing organization rather than by creating a new entity, that possibility does [not] undermine the conclusion that the Settlement is fair and adequate." ER 16. Addressing the arguments attacking the independence of the Foundation, the district court opined:

Objectors have not shown there is any substantial reason to doubt the independence of two of the three directors. The unanimity requirement for board votes is applicable only to structural changes, and not to funding decisions. While the director associated with Facebook may reasonably be expected to exercise his influence against the Foundation taking any actions that would clearly and directly harm Facebook, there has been no persuasive showing that the Foundation will be a mere publicity tool for Facebook, or in any meaningful sense under Facebook's direct control. To the extent objectors are arguing that that Foundation could be structured somewhat differently, or that it would be even better for the funds to go to some existing organization, such fine-tuning of the [S]ettlement reached by the parties is beyond the purview of the Court.

ER 16.

The district court also addressed the objectors' argument that the Settlement Agreement does not serve the interests of the class members.   The court held that in light of litigation risks and in the context of settlements involving claims of infringement of consumers' privacy rights, "the $9.5 million offered in settlement is substantial and, further, is directed toward a purpose closely related to Class Members' interests in this litigation."  ER 13-14.  The court rejected the objectors' arguments that "the 'safety' element of the Privacy Foundation charter is unrelated to the Class Members' claims," finding:

[G]iven the nexus of online privacy, safety and security, particularly as those values relate to the online threat landscape and the benefit of protecting consumers' identities and personal information online from those threats, the Privacy Foundation as constituted is sufficiently related to the claims raised by Class Members.

ER 13-14.

11

Finally, the court also addressed the objectors' argument that under the Settlement, class members receive no direct monetary compensation. ER 15. The court concluded that the expectation of recovery of statutory damages awards ("the only basis for compensation [the objectors] have addressed at any length"), "is speculative at best, given the inherent and particular litigation risks the Class would face in proceeding to trial." ER 15. "If only moderate statutory damages were awarded, the effect on the fund of incurring administrative costs to distribute *de minimis* amounts per Class Member leads to the conclusion that the certainty of the Settlement, as constituted, provides more meaningful relief to the Class." ER 15.

## SUMMARY OF ARGUMENT

Over the course of nearly a year, the parties, with the aid of a highly respected mediator, negotiated an elegant, innovative, and effective Settlement Agreement. Under the Settlement Agreement, an internet privacy foundation would be created (once this appeal is resolved) to use Settlement funds to further the very interests upon which plaintiffs premised their claims: the Foundation's clear directive is to promote the safety and security of personal information online.

Before approving the Settlement, the district court conducted two lengthy hearings and thoroughly examined the proposed Settlement. In approving the

Settlement, the district court determined that it was "fair, reasonable, adequate and proper and in the best interests of the Settlement Class." ER 12. The district court also found that the Settlement was "directed toward a purpose closely related to Class Members' interests in this litigation." ER 14.

The court acted well within its broad discretion in approving this Settlement, which allows the creation of a foundation as a *cy pres* recipient. In objecting to the Settlement because it funds a foundation rather than individual distributions, Appellants cite to inapposite decisions that did not deal with the issue of whether Settlement approval was improvidently granted based on the creation of the foundation *per se.* Contrary to Appellants' contentions, case law recognizes that it is appropriate for *cy pres* settlement funds to be administered by a foundation created under a settlement under the circumstances presented in this case—where a cash award to each class member would be *de minimis*, where the settlement resulted from an arms' length negotiation, where the Foundation's directors have significant experience in the field of internet privacy, and where the Foundation has a clear mission and directive directly tied to the interests of class members.

Nor are appellants correct that a district court must personally administer the allocation of funds constituting a *cy pres* award after the funds have been transferred to a grant-making organization. As an initial matter, Marek and Trotter did not object to the Settlement in the district court on this basis, and thus,

13

they have waived it on appeal. Moreover, the very authority Marek and Trotter cite makes clear that monitoring disbursement of *cy pres* funds is not an appropriate role for the district court. In any event, the district court under the judgment's express terms retained jurisdiction to oversee implementation of the Settlement and the "distribution or disposition of the Settlement Fund." ER 3.

The specter of a conflict of interest raised by Appellants has no basis, and their contention that the district court ignored the arguments regarding a potential conflict of interest is specious. The district court devoted a significant portion of the final fairness hearing and its findings of fact to the question of the propriety of a Facebook employee serving as an initial member of the Board of Directors of the Foundation as well as to the overall utility and function of the Foundation. The court correctly determined neither the presence of a Facebook employee on the Board of Directors nor a director chosen by class counsel creates a material conflict of interest or diminishes the suitability of the Foundation as the *cy pres* recipient.

The Foundation was carefully structured so that no single voice on the Board would predominate. No director has veto power: only two of the three directors' votes are needed to approve funding decisions. Moreover, the directors must unanimously approve the plan of succession that will govern the selection of future directors. That Facebook has a voice on the Foundation is entirely proper and

14

indeed furthers the purposes of the Settlement Agreement and the Foundation to protect the very interests plaintiffs advance.

## ARGUMENT

### I.    Standard of Review

Review of the district court's decision to approve a class action settlement is extremely limited.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000) (citing *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1238 (9th Cir. 1998); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)). The "decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is exposed to the litigants, and their strategies, positions, and proof."  *Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (internal quotations and citations omitted)).  This Court will not overturn a settlement approval order absent a "clear abuse of discretion." *Molski v. Gleich*, 318 F.3d 927, 953 (9th Cir. 2003), *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc*., 603 F.3d 571 (9th Cir. 2010).  In this case, the district court applied the proper legal standards in approving the Settlement and made factual findings that are squarely supported by the record below.

### II.    The District Court Acted Well Within Its Discretion in Approving the Settlement.

Appellants concede that their appeal "does not challenge usage of a *cy pres* remedy to resolve this class action."  (Appellants' Opening Brief ("AOB") at 21.)

15

Nevertheless, the lion's share of the opening brief catalogues alleged "dangers" of all *cy pres* remedies mentioned by various courts and recites ALI guidelines about implementing *cy pres* remedies only in appropriate situations.

*Cy pres* settlements are appropriate when, as here, distribution to individual class members would be *de minimis* and not feasible. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) ("Fluid recovery refers to the distribution of unclaimed or unclaimable funds to persons not found to be injured but who have interests similar to those of the class."), *cert. denied*, 129 S. Ct. 1673 (2009). "When a litigated or settled aggregate class recovery cannot feasibly be distributed to individual class members . . . the court may direct that such funds be applied prospectively to the indirect benefit of the class." 3 *Newberg on Class Actions* § 10:17 (4th ed. 2010). In a case like this one, where any potential recovery per class member would be small and where injunctive provisions represent a large part of the potential recovery, a *cy pres* resolution is appropriate and adequate. *New York v. Keds Corp.*, No. 93 CIV. 6708, 1994 WL 97201, at *3 (S.D.N.Y. Mar. 21, 1994); *Francisco v. Numismatic Guar. Corp.*, No. 06-61677-CIV, 2008 WL 649124, at *3 (S.D. Fla. Jan. 31, 2008). Moreover, a *cy pres* remedy is appropriate here because of the benefit it provides to the class members. As the district court concluded, "given the nexus of online privacy, safety and security, particularly as those values relate to the online threat landscape and the benefit of protecting

16

consumers' identities and personal information online from those threats, the Privacy Foundation as constituted is sufficiently related to the claims raised by Class Members." ER 14. Furthermore, as Judge Seeborg noted, the fact that only a few class members objected to the proposed Settlement further militates in favor of approval. ER 17.

## A.  A *Cy Pres* Award to the Foundation Is Appropriate.

To the extent that Appellants contend that a *cy pres* fund to a foundation is *per se* improper because it does not guarantee that the Settlement benefits will flow directly to the alleged class members, that contention has no basis in the law. The district court had ample discretion to approve the creation of a foundation to administer settlement funds. "Federal courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds." *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990). This Court has held that "the district court's choice among distribution options should be guided by the objectives of the underlying statute and the interests of the silent class members." *Id.* at 1307 (citing *California v. Levi Strauss & Co.*, 41 Cal. 3d 460 (Cal. 1986)); *see also Powell v. Georgia-Pacific Corp.*, 119 F.3d 703, 706-07 (8th Cir. 1997) (holding that the most appropriate and equitable disposition of funds remaining several years after the settlement of an employment discrimination class action was to create scholarship fund for African-American

17

high school students). Here, the interests of the class members and the objectives of the statutes underlying the class action are to address privacy violations on the Internet; the Foundation's objectives—promoting the safety and security of personal information online—are directly related to those very concerns.

The Seventh Circuit affirmed a district court's approval of a similar settlement agreement in *In re Mexico Money Transfer Litigation,* 164 F. Supp. 2d 1002, 1031-32 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001). In that case, customers of money transfer services providing electronic fund transfers of money to Mexico brought two class action suits against the services challenging their failure to disclose the rate mark-up on the exchange of dollars for pesos. *Id*. at 1007. The settlement in that case created two funds[3] to distribute *cy pres* moneys to charitable or public interest organizations that serve the community of persons injured by the alleged misconduct by "funding charitable and public interest projects that serve the Mexican and Mexican-American communities in the United States." *Id*. at 1011, 1031.

The directors of the fund included persons with substantial records of service with a "clear directive" that the funds be used to benefit entities whose primary purposes included services to Mexican-Americans or Mexican-American causes.

---

[3]    The settlement agreement also provided for the distribution of discount coupons and injunctive relief. *Id*. at 1010-11.

*Id.* at 1031-32.  Moreover, the court found that an objection asserting that the defendant would be in a position to dictate the use of the funds because one of its representatives would be on the board was of no consequence because non-biased persons with a clear public interest also would serve on the board.  *Id.*  Similarly, the district court in *In re Relafen Antitrust Litigation,* 231 F.R.D. 52, 82-83 (D. Mass. 2005) approved a *cy pres* award to a specific organization that would, among other things, create a sub-grant program for other non-profit organizations in specific states to carry out consumer education campaigns.

Appellants' reliance on *Six Mexican Workers* is misplaced.  In that case, this Court did not categorically reject the award of *cy pres* funds to a foundation. Instead, this Court held that the proposed *cy pres* plan *in that case* failed to provide adequate supervision over the distribution of funds in a class action by 1,349 undocumented Mexican workers who were employed by Arizona Citrus Growers. 904 F.2d at 1309.  The funds were to be given to the Inter-American Foundation, which operates human assistance projects in areas where many of the plaintiffs were believed to reside, "for distribution in Mexico" with the funds not earmarked for any specific projects.  *Id*. at 1304.  By contrast, the foundation to be established here will be run by highly qualified individuals who have been given a clear directive as to how the settlement funds should be spent.  And the Foundation's mission to fund and sponsor programs designed to educate users, regulators and

enterprises regarding critical issues relating to protection of identity and personal information online through user control, and the protection of users from online threats is clearly related to the interests of the class (Facebook users alleging that Beacon improperly disclosed personal information on the Internet).

The Seventh Circuit's decision in *In re Folding Carton Antitrust Litigation*, 744 F.2d 1252, 1253-55 (7th Cir. 1984) is also distinguishable. There, in the context of an antitrust case dealing with price-fixing among manufacturers of folding cartons, a proposed foundation was to conduct "research on complex antitrust litigation and on various substantive aspects of the antitrust laws" when such research already existed and would not benefit the class members whatsoever. *Id*. at 1254.[4]

---

[4]    In *Securities & Exchange Commission v. Bear Stearns & Co.*, 626 F. Supp. 2d 402, 419 (S.D.N.Y. 2009), on which Appellants so heavily rely, the district court held that residual funds from a consent decree should escheat to the government. Although the initial final judgment in that case had allotted funds to a foundation "to fund worthy and cost-efficient programs designed to provide investors with the knowledge and skills necessary to make informed investment decisions," the foundation was abandoned because of "organizational issues and difficulties that could not be overcome." *Id*. at 418 (internal quotations omitted). The court questioned "whether the SEC has the institutional resolve and commits adequate resources" to adequately expend the funds. *Id*. at 420. The court's rejection of the SEC's proposal that it, along with the New York Stock Exchange ("NYSE") and FINRA (formerly the National Association of Securities Dealers), receive the residual funds was based not on disapproval of the foundation or *cy pres* remedies generally but only on failed practical implementation of the foundation in the past.

**B.** **Appellants Waived The Argument That The Court And Not the Foundation Should Determine Who Receives *Cy Pres* Distributions**

Appellants waived their argument that it is improper for the Foundation rather than the district court to make decisions about the disbursement of the settlement funds by failing to raise this argument in the district court. Issues raised for the first time on appeal are ordinarily deemed waived. *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882-83 (9th Cir. 2003). This rule extends to objections against a class action settlement that are raised for the first time on appeal. *See, e.g.*, *Shaffer v. Cont'l Cas. Co.*, 362 Fed. Appx. 627, 632 n.1 (9th Cir. 2010) (Bea, J., concurring) (unpublished decision) ("The other [objector-]appellant [] waived these issues because he did not raise them below.").

Marek and Trotter never argued in the district court that permitting the Foundation rather than the district court to determine who receives the funds is improper. Instead, they objected to a *cy pres* distribution on the distinct bases that (1) the class members were being forced to release valuable claims and (2) the Foundation was not the best use of the funds. ER 70-73. The district court rejected these arguments. ER 15-16. Thus, Appellants waived the argument that the district court "improperly transferred its discretion" to the Foundation (AOB at 15) by failing to raise this issue below.

**C.    The District Court Did Not Abuse Its Discretion in Approving a Settlement Under Which the Court Does Not Personally Oversee the Grant-Making Conducted by the Foundation.**

Even if Appellants had not waived their contention that the district court, rather than the Foundation, should determine who receives *cy pres* distributions, the argument fails as matter of law.  The law does not insist that the court micro-manage the distribution of funds constituting a *cy pres* award once the funds have been transferred to a grant-making institution.  "Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

Indeed, Appellants' own chief authority, *Securities & Exchange Commission v. Bear Stearns & Co.*, 626 F. Supp. 2d 402, 414-15 (S.D.N.Y. 2009), recognizes that the kind of district court involvement urged by Appellants in this case is not appropriate.  Although that case did not involve the approval of a class action settlement,[5] the court (in the course of an extended discussion regarding *cy pres* remedies), expressly criticized the type of district court oversight Appellants urge here.  *Id.*  Immediately after noting that "some courts even go so far as to review

---

[5]    *Bear Stearns* concerned how the court would dispose of residual undistributed funds collected as a result of a consent decree between several investment banks and the SEC.  The court ultimately ordered the funds to escheat to the Department of Treasury.  *See* note 4 *supra.*

the effectiveness of these 'grants,'" the court cautioned that "[d]istributing grants and reviewing the effectiveness of their use is not an appropriate use of judicial resources and transforms courts into eleemosynary institutions." *Id*. at 415.

Although Appellants contend that the American Law Institute's precatory draft Principles of the Law of Aggregate Litigation (the "ALI Draft") establish that the district court, rather than a foundation, must have the authority to select the recipients of *cy pres* awards and disburse the class funds, the extensively quoted passages[6] say nothing of the sort. Indeed, the ALI Draft squarely supports the approach reflected in the Settlement Agreement here and approved by the district court after careful consideration. The ALI Draft indicates that *cy pres* remedies are appropriate when individual distributions are "impossible or unfair." *Bear Stearns*, 626 F. Supp. at 416 (quoting ALI Draft, § 3.07 at 231). Even Appellants admit that this is "clearly the situation in the case at bar." (AOB at 32.)

The district court did not abdicate any responsibilities to oversee the granting and funding of the new Foundation; rather, it was fully satisfied with the details the parties provided, and concluded that the Foundation had a clear and appropriate directive concerning how the funds should be spent. Contrary to Appellants' characterization of the Foundation as "nebulous," the Foundation has a

---

[6]    Two full pages of Appellants' Opening Brief consist of quotations from the *Bear Stearns* decision, which in turn quotes the ALI Draft. (AOB at 31-33.)

targeted mission involving the precise subject matter of the litigation and is directed towards protecting the interests on which plaintiffs' claims are premised.[7] ER 112. The district court made an express factual finding that the Settlement was "directed toward a purpose closely related to Class Members' interests in this litigation." ER 14. Appellants do not and could not contend that finding was clearly erroneous.

Moreover, Appellants' argument rests on the false premise that the district court has relinquished its jurisdiction. To the contrary, the district court retains jurisdiction until the funds are completely distributed.[8] Indeed, in this case, the district court in the Rule 54(b) judgment expressly "retain[ed] continuing jurisdiction over (i) implementation of the Settlement; (ii) distribution or

---

[7]    The ALI Draft also suggests that a *cy pres* remedy is appropriate "only if the parties can identify a recipient involving the same subject matter as the lawsuit that reasonably approximates the interests being pursued by the class." *Bear Stearns*, 626 F. Supp. at 416 (quoting ALI Draft, § 3.07 at 231).

[8]    *See, e.g.*, *Beecher v. Able*, 575 F.2d 1010, 1016 (2nd Cir. 1978) ("Until the fund created by the settlement is actually distributed, the court retains its traditional equity powers. It is not novel law to announce that a court supervising the distribution of a trust fund has the inherent power and the duty to protect unnamed, but interested persons.") (quoting *Zients v. LaMorte*, 459 F.2d 628, 630 (2nd Cir. 1972); *In re Folding Carton Antitrust Litig.*, 687 F. Supp. 1223,1224 (N.D. Ill. 1988) (retaining jurisdiction in order to "supervise the investment of the fund and its distribution"); *In re Lease Oil Antitrust Litig. (No. II)*, MDL No. 1206, 2007 WL 4377835, at *23 (S.D. Tex. Dec. 12, 2007) ("As is appropriate for such a *cy pres* distribution, this Court will maintain continuing jurisdiction over the remaining funds in order to supervise the proposed Project and any future distributions.").

disposition of the Settlement Fund; (iii) further proceedings, if necessary, on applications for attorneys' fees, expenses, and costs in connection with the Litigation and Settlement; and (d) the Parties for the purpose of construing, enforcing, and administering the Settlement Agreement." ER 5.

In sum, Appellants' concern about the supposed "lack of district court involvement and oversight with regard to, for example, subsequent 'granting and funding' by the foundation to ensure adherence to well-established *cy pres* principles" (AOB at 21-22), is meritless. The district court correctly determined that the Foundation will be structured with safeguards to ensure that the funds will be distributed in a manner that benefits the entire class. The Foundation will be in a position to fulfill its mission through the most fitting projects and organizations it can identify, with a long life over which to monitor success and function as an important source of support for a variety of programs.

### D. The Distinguished, Relevant, and Varied Backgrounds of the Foundation's Board of Directors Lay to Rest Any Concerns About the "Track Record" of the Foundation.

Appellants' contention that the Foundation is somehow inadequate because it does not have a "prior track record in grant making" is similarly baseless. Although the Foundation is a newly created entity, it is built upon the expertise of three highly qualified individuals. In *Mexico Money Transfer*, a district court approved a *cy pres* distribution in which the directors of the funds (including a

25

representative of the defendant in the case and plaintiffs' lead counsel) had substantial records of service and a clear directive concerning how the funds would be used. 164 F. Supp. 2d at 1031-32.

Just as the directors in *Mexico Money Transfer* had substantial records of relevant service, so too do the Foundation's directors here. Aside from his present affiliation with Facebook, Mr. Sparapani is a well-respected former Senior Legislative Counsel at the American Civil Liberties Union, who specialized in privacy rights and represented civil liberties groups before Congress and the Executive Branch. ER 61.

The two other directors are similarly distinguished in the privacy field, and have no affiliation with Facebook. Chris J. Hoofnagle is the Director of the Information Privacy Programs at the Berkeley Center for Law and Technology, and a Senior Fellow at the Samuelson Law, Technology & Public Policy Clinic. ER 60-61. Mr. Hoofnagle has published numerous academic articles, lectures on privacy topics worldwide, and has testified before Congress many times regarding privacy issues. ER 61. Mr. Hoofnagle was the Director of the West Coast Office and Senior Counsel of Electronic Privacy Information Center for six years. *Id.*

Likewise, Larry Magid is an accomplished internet safety advocate. He is a board member of the National Center for Missing & Exploited Children and a member of the Obama administration's Online Safety & Technology Working

26

Group, where he chairs the education sub-committee.  *Id*.  Mr. Magid is also on the advisory boards of both GetNetWise.org and the Family Online Safety Institute. Finally, Mr. Magid served on the Internet Safety Technical Task Force, formed by 49 state attorneys general and Fox Interactive/MySpace, and based at Harvard University's Berkman Center for Internet & Society.  *Id*.

These individuals' combined and diverse track records amply demonstrate that the Foundation is a proper recipient of the *cy pres* funds.

###### E.    The District Court Adequately Scrutinized the Settlement for Any Potential for Conflict of Interest.

Appellants' opening rhetoric about the board members' "conflicts of interest" is long on hyperbole and innuendo but short on substance.  Appellants make a number of extreme allegations to the Court, including a whopper about "the potential for all board members of the Privacy Foundation to promote their own prurient interests."  (AOB at 20.)  Appellants' allusion to "the inexplicable failure to properly evaluate irreconcilable conflicts of interest which is fatal to final approval of the class action [S]ettlement" is baseless.  (*See* AOB at 16.)  The district court thoroughly analyzed these questions during the final fairness hearing. SER 17-26.  The district court carefully reviewed the make-up of the Foundation's Board of Directors, considered arguments regarding the Board's structure, and correctly rejected Appellants' conflict of interest arguments.

### 1.    The Structure of the Foundation Assures No Conflict of Interest.

The record belies Appellants' claim that the Foundation will be under "imperial control" or "complete dominion" of class counsel or Facebook. Appellants' assertions appear to stem from the composition of the initial Board of Directors of the Foundation. Mr. Sparapani, who is an employee of Facebook, is one of three members of the Board of Directors of the Foundation.

The Foundation has been carefully structured (as a result of the mediations, among other things) to ensure that no single point of view can or will predominate. Because two of the three directors are needed to approve funding decisions, no single director possesses veto power in determining who will receive grants from the Foundation. In addition, a unanimous vote of all three directors is required to determine a plan of succession for future directors. This requirement ensures that no one director will control the Foundation. Although Mr. Sparapani may reasonably be expected to exercise his influence against any actions that could clearly and directly harm Facebook, the notion that the Foundation will be under Facebook's control is baseless conjecture.[9]

---

[9]    Moreover, as counsel for Facebook pointed out to the district court, the Foundation's bylaws explicitly state that the Foundation "shall not sponsor any litigation or lobbying matters." SER 4; 40.

28

The Seventh Circuit upheld a settlement agreement involving a similar structure in *Mexico Money Transfer*, 164 F. Supp. 2d at 1031-32. There, the district court rejected the notion that the funds established to administer the settlements were objectionable because one of the defendants had a representative on the Board. *Id.* The court explained that because other non-biased persons with a clear public interest would also serve on the Board, the fact that a defendant had a representative on the board was of no moment. *Id.*

### 2.    A *Cy Pres* Remedy That Takes the Defendant's Perspective Into Account, or Even Benefits a Defendant, Is Permissible.

Appellants cite no authority to support their contention that a *cy pres* remedy should never take into account the perspective of the settling defendant. This is not surprising in light of the case law establishing that a *cy pres* foundation is permissible even if it may confer some conceivable "benefit" on the defendant. Indeed, Appellants seem to be advocating that all *cy pres* distributions be determined in advance, implicitly recognizing that Facebook would have had a role in such predeterminations. It thus strains reason to suggest that, while Facebook could exert influence over the grants before court approval, it cannot task one employee to assume a participatory role in grant decisions afterward.

At least one court has approved a *cy pres* distribution in which the committee administering the funds included representatives of the defendants and lead counsel for plaintiffs. *See Mexico Money Transfer*, 164 F. Supp. 2d at 1032

(approving *cy pres* funds to be administered by a committee made up of leaders in the Mexican-American community, plaintiffs' lead counsel, and a representative for each of the defendants in the case). Moreover, "there is no *per se* prohibition on the defendant receiving a business benefit as a result of a settlement." *Parker v. Time Warner Entm'tCo.*, 239 F.R.D. 318, 341 (E.D.N.Y. 2007); *see also Nelson v. Greater Gadsen Housing Authority*, 802 F.2d 405, 409 (11th Cir. 1986) (upholding a *cy pres* remedy that benefited defendants' property).[10]

As the district court explained in the final fairness hearing, in this case, the inclusion of Facebook's viewpoint in the initial Board of Directors makes good sense and indeed advances the purposes of the Foundation:

> Well, I suppose I go back to this notion that if you posit a foundation that is supposed to be looking into issues of online security and privacy and the like, there are going to be various viewpoints that are going to go into that equation. One of which is Facebook and its other associated, entities that are associated or in the same type of operation. And you want those views to also be involved. … You don't set up the foundation and say we only want to hear from one side of the discussion. We want all sides to have a place at the table to discuss these very difficult issues of privacy and security and the like.

---

[10] Although some district court case law indicates that it may be inappropriate for unclaimed funds to revert to a defendant, this case does not involve the application of *cy pres* to dispose of unclaimed funds, nor will any funds revert to Facebook. *See In re Lease Oil Antitrust Litig. (No. II)*, 2007 WL 4377835, at *19 (citing *Diamond Chem. Co. v. Akzo Nobel Chem. B.V.*, 517 F. Supp. 2d 212, 218-219 (D.D.C. 2007)).

SER 24.    There is nothing objectionable about the initial Board of Directors including a Facebook employee and a Board member selected by class counsel.

## CONCLUSION

For the reasons stated above, Facebook respectfully requests that the Court affirm the District Court's final judgment and order of dismissal and its approval of approval of the class settlement.


Dated: December 15, 2010

COOLEY LLP


By:  /s/ *Michael G. Rhodes*
Michael G. Rhodes

## CERTIFICATE OF COMPLIANCE PURSUANT TO FRAP 32(A)(7)(C) AND CIRCUIT RULE 32-1

I certify that, pursuant to Fed. R. App. P. 31(a)(7)(C) and Ninth Circuit Rule 32-1, the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and contains 7,106 words.

Dated: December 15, 2010

COOLEY LLP

By: __/s/ *Michael G. Rhodes*_____
Michael G. Rhodes

32

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6 Defendant-Appellee Facebook states that it is not aware of any cases related to this action, aside from the cases referenced in Appellant's Opening Brief.

Dated:  December 15, 2010

COOLEY LLP

By:   /s/ *Michael G. Rhodes*
Michael G. Rhodes

Attorneys for Appellee
Facebook, Inc.

33

## CERTIFICATE OF SERVICE

I certify that on December 15, 2010, I electronically filed the foregoing

**ANSWERING BRIEF OF DEFENDANTS-APPELLEES FACEBOOK, INC.**

with the Clerk of the Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system. Participants in this case who are registered CM/ECF users will

be served electronically by the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

I further certify that a copy of the Supplemental Record Excerpts has been

served, via FedEx upon:

| | |
|---|---|
| John Davis | Steven  F. Helfand |
| Law Office of John W. Davis | Helfand Law Offices |
| 501 W. Broadway, Suite 800 | 582 Market Street, Suite 1400 |
| San Diego, CA 92101 | San Francisco, CA 94104 |
| | |
| Frank Converse Brame | Scott A. Kamber |
| Vinson & Elkins L.L.P. | KamberLaw, LLC |
| Trammell Crow Center, Suite 3700 | 100 Wall Street, 23rd floor |
| 2001 Ross Avenue | New York, NY 10005 |
| Dallas, TX 75201-2975 | |
| | |
| Shawn Hanson | |
| Akin Gump Strauss  Hauer & Feld LLP | |
| 15th Floor | |
| 580 California Street | |
| San Francisco, CA 94104-1036 | |

By:  _/s/ *Michael G. Rhodes*_
            Michael G. Rhodes